IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HARRY M. WOOD, III,                 )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )  Civ. No. 05-0432-SLR
                                    )
JO ANNE B. BARNHART,                )
Commissioner, Social                )
Security Administration,            )
                                    )
        Defendant.                  )
                                    )
                                    )

_____

Steven L. Butler, Esquire of the Law Office of Gary Linarducci, New Castle, Delaware. Counsel for Plaintiff.

Colm F. Connolly, Esquire, United States Attorney, of the United State's Attorney's Office, Wilmington, Delaware. Counsel for Defendants. Of Counsel: David F. Chermol, Esquire, Special Assistant United States Attorney for the District of Delaware, Donna L. Calvert, Esquire, Regional Chief Counsel, and Lori Karimoto, Assistant Regional Counsel of the Office of the General Counsel of the Social Security Administration, Philadelphia, Pennsylvania.

_____

**MEMORANDUM OPINION**

Dated: September  1 , 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

Presently before the court is an appeal pursuant to 42
U.S.C. §§ 405(g) and 1383(c)(3) filed by plaintiff, Harry M.
Wood, III, seeking review of the final decision of defendant, Jo
Anne B. Barnhart, Commissioner of the Social Security
Administration (the "Commissioner"), denying plaintiff's
application for disability insurance benefits ("DIB") under
Titles II of the Social Security Act (the "Act"), 42 U.S.C. §§
401-433, and supplemental security income ("SSI") under Title XVI
of the Act, 42 U.S.C. §§ 1381-1383(f).  Plaintiff has filed a
motion for summary judgment (D.I. 13) requesting the court to
reverse the decision of the Commissioner and award him benefits.
In response to plaintiff's motion, defendant has filed a cross-
motion for summary judgment (D.I. 15) requesting the court to
affirm her decision.  For the reasons set forth below,
defendant's cross-motion for summary judgment will be granted,
and plaintiff's motion for summary judgment will be denied.  The
decision of the Commissioner dated September 18, 2004, will be
affirmed.

## II.   PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB and SSI on November
21, 2002, alleging disability since June 9, 2001, because of neck
and back problems and depression that developed after he was
involved in an automobile accident.  (D.I. 8 at 50-52, 406-410,

64) Through his attorney, plaintiff later amended his claim to allege a disability onset date of September 15, 2002. (Id. at 424-425) Plaintiff's application was denied initially, and upon reconsideration. (Id. at 29-32, 35-39) Plaintiff filed a request for an administrative hearing before an Administrative Law Judge ("A.L.J."), and the A.L.J. held a hearing on August 3, 2004. (Id. at 417-433)

On September 18, 2004, the A.L.J. issued a decision denying plaintiff's claims for DIB and SSI. (Id. at 15-25) Plaintiff requested a review of the decision by the Appeals Council, but the Appeals Council denied his request for review. (Id. at 8-10) Accordingly, the A.L.J.'s September 18, 2004 decision became the final decision of the Commissioner. Sims v. Apfel, 530 U.S. 103, 107 (2000).

After completing the process of administrative review, plaintiff filed the instant civil action pursuant to 42 U.S.C. §§ 405(g) and 1483(c) seeking review of the A.L.J.'s decision denying his claims for DIB and SSI. In response to the complaint, defendant filed an answer (D.I. 6) and the transcript (D.I. 8) of the proceedings at the administrative level.

Thereafter, plaintiff filed a motion for summary judgment and opening brief (D.I. 13, 14) in support of the motion. In response, defendant filed a cross-motion for summary judgment and a combined opening and answering brief (D.I. 15, 16) requesting

the court to affirm the A.L.J.'s decision. Plaintiff has waived
his right to file a reply brief (D.I. 18) and, therefore, this
matter is fully briefed and ripe for the court's review.

## III. FACTUAL BACKGROUND

### A. Plaintiff's Medical History, Condition and Treatment

At the time the A.L.J. issued his decision in this case,
plaintiff was forty-seven years old. (D.I. 8 at 27, 100, 122)
Plaintiff obtained a G.E.D. and worked as an assistant calendar
operator, a mechanic, a bus driver, and an equipment operator.
(Id. at 65, 73) Plaintiff worked until September 2002.

On June 9, 2001, plaintiff was hit from behind by a drunk
driver. He was taken to Christiana Hospital by helicopter and
was seen by Ali Kalamchi, M.D., an orthopedic surgeon. X-rays of
plaintiff's cervical and lumbar spine, chest and pelvis were all
normal. (Id. at 160-161) A CT scan of plaintiff's abdomen and
pelvis revealed no hemoperitonem or organ injury. (Id. at 162)
Plaintiff was diagnosed with a T9 compression fracture, a non-
displaced medial malleolar fracture of the right ankle (Id. at
161, 112), and a contusion of the back. Plaintiff was
hospitalized for five days and released on June 15, 2001, with
instructions not to work or bear weight on his right leg until he
was seen for a follow-up visit.

Plaintiff reported to Brent Noyes, M.D., an orthopedic
surgeon, for a follow-up evaluation of his right ankle fracture.

3

Dr. Noyes noted continued pain and swelling of plaintiff's right ankle. Plaintiff was placed in a short-legged cast for two weeks. (Id. at 278)

Plaintiff also continued to treat with Dr. Kalamchi. Plaintiff reported problems in his mid-thoracic region and lower back, including shooting pain that extended down his left leg with some numbness in his toes. X-rays of plaintiff showed a "mild compression with about three percent loss of height with end plate irregularity." (Id. at 214) Upon examination, Dr. Kalamchi noticed a mild increase in thoracic kyphosis and tenderness over the T-9 region. (Id.) Dr. Kalamchi referred plaintiff to physical therapy.

Plaintiff's physical therapy evaluation noted that his x-rays revealed "good healing" in his right ankle. Although plaintiff reported pain in his ankle, he took no pain medications. Plaintiff's progress during therapy was also tracked through follow-up visits with Dr. Kalamchi. Dr. Kalamchi noted improvements in plaintiff's condition, including that plaintiff was walking better, had negative straight leg raising tests ("SLR"), and his forward flexion was essentially free. Plaintiff continued to complain of discomfort and difficulty sitting and opined that his ankle fracture had not healed. Dr. Kalamchi noted that plaintiff had an "exaggerated response to simple touching of the middle thoracic region" and no change in

4

the clinical kyphosis. X-rays also indicated "no change in the alignment of his T-9 mild compression fracture." (Id. at 211)

On October 23, 2001, plaintiff also began treatment with Dr. Bruce Katz, M.D., an orthopedic surgeon. Dr. Katz instructed plaintiff to undergo further tests and told him to limit himself to light duty work with no lifting or carrying greater than 15 pounds and no operation of heavy power tools.

Plaintiff reported back to Dr. Katz and indicated that he could not undergo the MRI Dr. Katz had ordered due to insurance problems. Plaintiff continued to complain of back pain. However, plaintiff also reported that he was splitting wood at home, doing work on his truck, doing heavy lifting and "really doing his normal activities." (Id. at 264) Plaintiff also expressed his desire to return to full duty work. On physical examination, Dr. Katz found only "mild tenderness" over his lower lumbosacral region. (Id.) In December 2001, both Dr. Katz and Dr. Noyes gave plaintiff permission to return to work. (Id. at 255, 264)

Plaintiff returned to work in December 2001 and continued working until September 2002, when he was terminated. During his employment, plaintiff obtained medical insurance coverage and was able to undergo the MRI Dr. Katz had ordered. An MRI of plaintiff's cervical spine indicated that "soft disc herniations are present from C4-C7 largest at C5-C6 eccentric to the right,"

which caused "mild spinal stenosis." (Id. at 261) An MRI of plaintiff's thoracic spine revealed wedging at T9, with no evidence of an acute compression fracture, disc herniation or spinal compression. (Id. at 258) An MRI of plaintiff's lumbar spine indicated "mild" degenerative changes at L4-S1. (Id. at 259) At his follow-up examination, Dr. Katz reviewed the MRI and discussed with plaintiff the possibility of a selective nerve root block at right C6 and, if no relief, at right C7. As of August 2002, plaintiff failed to make any decision regarding whether to undergo the nerve root injections. (Id. at 253) In a letter dated August 28, 2002, Dr. Katz opined that plaintiff suffered permanent injuries, but did not indicate that there were any work restrictions on plaintiff.

In September 2002, plaintiff was admitted to Meadow Wood Hospital. He was taken to the Emergency Room by police who stopped him while he was walking to the hospital. Plaintiff indicated that he was depressed for months, but denied having any homicidal or suicidal ideation. Plaintiff also stated that he had been abusing crack for the past two days and had consumed three beers in the ten-hour period prior to his admission. Plaintiff also admitted a history of drug abuse, beginning with the use of codeine cough syrup at age 7 and escalating to free-base cocaine in the 1980s and then crack cocaine in the year 2000. Plaintiff was "concerned about having his cocaine abuse

6

becoming the major source of need for treatment," and he reported feelings of hopelessness and difficulties with his personal relationships. (Id. at 219) Plaintiff was hospitalized at Meadow Wood until mid-October 2002 in order to stabilize his mood. (Id. at 218) Plaintiff was diagnosed with major depression, cocaine abuse and back pain. Plaintiff's physical examination while at Meadow Wood was within normal limits, but Dr. DeFrate rated plaintiff's global assessment of functioning ("GAF") at 30 upon his admission.[1] (Id. at 219)

During his hospitalization, plaintiff participated in therapy and took various medications. Plaintiff's mood improved and his GAF score upon discharge was 60.[2] Plaintiff sought follow-up treatment with Amy Poole, L.C.S.W., who diagnosed him with polysubstance abuse. (Id. at 405) Plaintiff stopped seeing Dr. Poole, because he disliked her focus on his substance abuse. (Id. at 432)

Plaintiff continued to report back, neck and arm problems and had a second set of MRIs taken in November 2002, which

---

[1] GAF scores between 21 and 31 suggest a serious impairment in communication or judgment or the inability to function in almost all areas. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 1994).

[2] GAF scores between 51 and 60 suggest either moderate symptoms or a moderate difficulty in social, occupational or school functioning. Diagnostic and Statistical Manual of Mental Disorders at 34.

7

revealed results which were essentially unchanged from his previous studies, except for a "slightly more prominent" right central soft disc herniation at C4-C5. (Id. at 252, 249) Dr. Katz gave plaintiff a cervical epidural injection in January 2003, and referred him to Dr. Yadhati for pain management services. Plaintiff was placed on light duty pending the outcome of an EMG evaluation. (Id. at 247, 291-301) Plaintiff's EMG results indicated that he had polyradiculopathy affecting various myotomes of his upper extremity. It also suggested that plaintiff had "mild" carpal tunnel syndrome ("CTS") that was worse on his right side. (Id. at 290)

In April 2003, plaintiff underwent a mental health evaluation with Beth McKee, L.C.W.W. (Id. at 321-326) Plaintiff complained of depression, difficulty sleeping, appetite fluctuations, sadness, difficulty concentrating and anxiety. Plaintiff stated that when his depression was controlled, he did not abuse drugs. (Id. at 322-323) Ms. McKee diagnosed him with polysubstance abuse and moderate recurrent depression. (Id. at 326)

That same month, plaintiff also underwent a psychiatric evaluation with Michelle Gillespie, A.R.N.P. (Id. at 315-319) Plaintiff advised Ms. Gillespie that his last drug binge cost $7,000, and that he lived in different places. Plaintiff indicated that he enjoyed going to the beach, shooting, fishing,

8

and hunting. (Id. at 315) Plaintiff became angry when he was questioned about his substance abuse, but was otherwise cooperative and friendly with coherent speech. (Id. at 316) Plaintiff's common sense was good, and his impulse control was fair. (Id. at 317) Ms. Gillespie estimated plaintiff's GAF to be 40[3], and set in motion a treatment plan which included medication and therapy. (Id. at 318)

During his May 2003 medication check, plaintiff reported that he was doing "good" and being "more balanced." However, plaintiff also admitted during his therapy session the same month that he binged on crack cocaine 3 or 4 times since he began his therapy. (Id. at 313-314)

In May 2003, a physician from Disability Determination Service ("DDS") completed a physical residual functional capacity ("RFC") assessment of plaintiff and opined that plaintiff was capable of performing a limited range of light exertional work. (Id. at 302-311) It was noted that plaintiff had the capability to occasionally lift up to 20 pounds, frequently lift up to 10 pounds and sit or stand or walk for six hours in an eight hour work day. The non-examining DDS physician also noted that plaintiff could only occasionally climb, stoop, kneel, crouch and

---

[3]     A GAF score of 40 indicates some impairment in reality testing or communication or a major impairment in several areas like work, school, family relations, judgment, thinking or mood. Diagnostic and Statistical Manual of Mental Disorders, at 32.

crawl, and plaintiff should not be exposed to concentrated fumes,

wetness, humidity, and hazards.  The DDS physician further opined

that plaintiff should avoid moderate exposure to extreme cold.  A

second DDS physician agreed with this assessment.  (Id. at 346-

347)

On June 20, 2003, a DDS psychologist completed a Psychiatric

Review Technique and Mental Residual Functional Capacity

Assessment.  Plaintiff was evaluated for medical listing 12.04

(affective disorders).[4]  The DDS psychologist opined that

---

[4]     The requirements of Listing 12.04 are:

A. Medically documented persistence, either continuous
or intermittent, of one of the following:

1. Depressive syndrome . . . ; or

2. Manic syndrome . . .;  or

3. Bipolar syndrome with a history of episodic
periods manifested by the full symptomatic picture
of both manic and depressive symptoms (and
currently characterized by either or both
syndromes); AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily
living; or

2. Marked difficulties in maintaining social
functioning; or;

3. Marked difficulties in maintaining
concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of
extended duration OR

10

plaintiff had mild restriction of activities of daily living, mild difficulties maintaining social functioning and moderate difficulties maintaining concentration persistence and pace.  The psychologist also opined that plaintiff would be moderately limited in his ability to (1) understand, remember and carry out detailed instructions, (2) maintain attention and concentration for extended periods of time, (3) complete a normal workday and workweek without interruption from psychologically based symptoms and (4) perform at a consistent pace without an unreasonable number and length of rest periods.  (Id. at 340-343)  The DDS psychologist found that plaintiff was not significantly limited

---

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> > 1. Repeated episodes of decompensation, each of extended duration; or
> >
> > 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> >
> > 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, App. 1, § 12.04.

11

in his ability to (1) remember locations and work-like procedures, (2) understand, remember and carry out short and simple instructions, (3) perform activities within a regular schedule, (4) maintain regular attendance and be punctual, (5) sustain an ordinary routine without special supervision, (6) work in coordination or proximity to others without being distracted, (7) make simple work-related decisions, (8) interact with the general public, (9) ask simple questions or request assistance, (10)  accept instructions and respond appropriately to criticisms, (11) get along with coworkers without distracting them or exhibiting extreme behavior, (12) maintain socially appropriate behavior and (13) adhere to basic standards of neatness and cleanliness.  Plaintiff was also found to be "not significantly limited" in his ability to respond to changes in the work setting, in his awareness of normal hazards and his ability to take precautions against them, his ability to travel in unfamiliar places and use public transportation and his ability to set realistic goals and plans independently of others. Based on these findings, the DDS psychologist opined that plaintiff did not meet the criteria for an affective disorder and was capable of performing light work.  A second DDS psychologist also agreed with this assessment.  (Id. at 346-349)

In July 2003, plaintiff sought pain management services from Dr. Balu for chronic neck, mid and low back, and bilateral upper

12

extremity discomfort. Plaintiff said he was restricted to light duties. (Id. at 368-369) Although he complained of tenderness, Dr. Balu elicited no focal weakness on manual muscle testing. Dr. Balu diagnosed chronic facet syndrome and radiculopathy and prescribed medication and fluoroscopic guided facet or epidural injections as needed. At subsequent visits, Dr. Balu refilled plaintiff's prescriptions, but no injections were needed. Plaintiff was given a splint to wear on his right wrist for CTS. Dr. Balu determined that plaintiff's condition was stable with this treatment and referred him to a back-to-work program. (Id. at 363-363) Dr. Balu later opined that plaintiff could not work. (Id. at 359-360)

In November 2003, plaintiff was admitted into a partial hospital treatment program for increased depression and suicidal ideation. (Id. at 372-391) Plaintiff reported that he relapsed into substance abuse over the summer using crack cocaine and heroin and consuming up to 36 beers each day. Plaintiff also complained of financial stressors, including defaults on his electric bills. Plaintiff reported that he did not have enough food to eat, but he gained ten pounds over the past 2 months. Dr. DeFrate rated plaintiff's GAF at 45 upon his admission.[5]

---

[5]     GAF scores between 41 and 50 suggest serious symptoms or any serious impairment in social, occupational or school functioning. Diagnostic and Statistical Manual of Mental Disorders at 34.

13

Plaintiff participated in therapy and his condition improved.
Upon discharge, his GAF was 55, and he was diagnosed with
episodic opiate dependence and moderate recurrent depression.
(Id. at 374)

In April 2004, plaintiff sought emergency room treatment due
to back pain.  (Id. at 355-358)  He said he felt his back "snap"
two days earlier.  Plaintiff's neurological exam was normal and
his back x-rays were negative.  At that time, plaintiff was
diagnosed with a back sprain/strain.  (Id. at 357)

## B.    The A.L.J.'s Decision

On August 3, 2004, the A.L.J. conducted a hearing on
plaintiff's applications for DIB and SSI.  (Id. at 23-62)  At the
hearing, plaintiff was represented by counsel.  In addition to
plaintiff, a vocational expert testified.  The vocational expert
explained that plaintiff's past work included both skilled and
semi-skilled jobs, and that some jobs fell within the medium
physical demand level, while other jobs fell within the heavy
physical demand level.  The A.L.J. asked the vocational expert to
consider a hypothetical individual with plaintiff's education and
work experience, who is clean and sober, able to understand,
remember and carry out simple instructions and able to perform
work at the light exertional level.  The vocational expert
identified three examples of jobs existing in the national and
local economy that could be performed by the hypothetical person

14

described by the A.L.J., including small products assembler, inventory clerk and residential cleaner. The vocational expert also indicated that her list of examples was not exhaustive.

In his decision dated September 18, 2004, the A.L.J. found that plaintiff's degenerative disc disease, central soft disc herniations in the cervical spine with radiculopathy, carpal tunnel syndrome, residual pain from ankle fracture, depression and polysubstance abuse were "severe" impairments, but that the conditions did not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.  (Id. at 24) Evaluating plaintiff's credibility, the A.L.J. found that his allegations regarding his limitations were not fully credible, and that plaintiff retained the residual functional capacity to perform a significant range of light work and that a significant number of such jobs exist in the national economy.

## IV.  STANDARD OF REVIEW

Findings of fact made by the Commissioner are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. Monsour Medical Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record.  Id.  In other words, even

15

if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence.  Id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence.  As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pierce v. Underwood, 487 U.S. 552, 555 (1988).

With regard to the Supreme Court's definition of "substantial evidence," the Court of Appeals for the Third Circuit has further instructed that "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion."  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).  Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach.  Id.; Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

16

## V. DISCUSSION

### A. Evaluation Of Disability And Social Security Claims

Within the meaning of social security law, a "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." 20 C.F.R. §§ 404.1505, 416.905. In order to qualify for disability insurance benefits, the claimant must establish that he or she was disabled prior to the date he or she was last insured. 20 C.F.R. § 404.131, Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990). The claimant bears the initial burden of proving disability. 20 C.F.R. §§ 404.1512(a), 416.912(a); Podeworthy v. Harris, 745 F.2d 210, 217 (3d Cir. 1984).

In determining whether a person is disabled, the Regulations require the A.L.J. to perform a sequential five-step analysis. 20 C.F.R. §§ 404.1520, 416.920. In step one, the A.L.J. must determine whether the claimant is currently engaged in substantial gainful activity. In step two, the A.L.J. must

17

determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that his or her impairment is severe, he or she is ineligible for benefits. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).

If the claimant's impairment is severe, the A.L.J. proceeds to step three. In step three, the A.L.J. must compare the medical evidence of the claimant's impairment with a list of impairments presumed severe enough to preclude any substantial gainful work. Id. at 428. If the claimant's impairment meets or equals a listed impairment, the claimant is considered disabled. If the claimant's impairment does not meet or equal a listed impairment, the A.L.J.'s analysis proceeds to steps four and five. Id.

In step four, the A.L.J. is required to consider whether the claimant retains the residual functional capacity to perform his or her past relevant work. Id. The claimant bears the burden of establishing that he or she cannot return to his or her past relevant work. Id.

In step five, the A.L.J. must consider whether the claimant is capable of performing any other available work in the national economy. At this stage the burden of production shifts to the Commissioner, who must show that the claimant is capable of performing other work if the claimant's disability claim is to be denied. Id. Specifically, the A.L.J. must find that there are

18

other jobs existing in significant numbers in the national
economy, which the claimant can perform consistent with the
claimant's medical impairments, age, education, past work
experience and residual functional capacity.  Id.  In making this
determination, the A.L.J. must analyze the cumulative effect of
all of the claimant's impairments.  At this step, the A.L.J.
often seeks the assistance of a vocational expert.  Id. at 428.

## B.   Whether The A.L.J.'s Decision Is Supported By Substantial Evidence

By his motion, plaintiff contends that the A.L.J.'s
determination that he could perform work in the light exertional
range was not supported by substantial evidence.  Specifically,
plaintiff contends that the A.L.J. erred in (1) evaluating
plaintiff's credibility and assessing plaintiff's limitations and
subjective complaints in light of the erroneous credibility
determination, and (2) failing to include all of plaintiff's
documented limitations in considering plaintiff's RFC and the
testimony of the vocational expert.  Plaintiff also contends that
new and material evidence has become available as a result of
plaintiff's continuing treatment which demonstrates that
plaintiff's condition is more severe than the A.L.J. determined
in his initial decision.

19

1. **Whether The A.L.J. Erred In Evaluating Plaintiff's Credibility And Assessing His Limitations In Light Of His Subjective Complaints**

Plaintiff contends that the A.L.J. improperly evaluated his credibility, which in turn, caused the A.L.J. to ignore plaintiff's subjective complaints and limitations. Specifically, plaintiff contends that the A.L.J. misconstrued his testimony and his written statements in the record. Plaintiff contends that his statements demonstrate that he could only occasionally perform certain household and other activities and that he had given up many activities he had enjoyed like hunting, fishing and hiking because of his pain. Plaintiff also reiterates his testimony that he is required to lay down at least one hour a day, and sometimes two or three hours on "bad days," and that he stopped working because of mental and physical impairments. Plaintiff contends that the A.L.J. failed to take into account his subjective complaints of pain, and instead relied on his biases concerning plaintiff's illegal drug use.

Generally, the A.L.J.'s assessment of a plaintiff's credibility is afforded great deference, because the A.L.J. is in the best position to evaluate the demeanor and attitude of the plaintiff. See e.g. Griffiths v. Callahan, 138 F.3d 1150, 1152 (8th Cir. 1998); Wilson v. Apfel, 1999 WL 992723, *3 (E.D. Pa. Oct. 29, 1999). However, the A.L.J. must explain the reasons for his or her credibility determinations. Schonewolf v. Callahan,

972 F. Supp. 277, 286 (D.N.J. 1997) (citations omitted).

After reviewing the record as it relates to the A.L.J.'s assessment of plaintiff's credibility, the court concludes that the A.L.J.'s credibility determination was adequately explained and is supported by substantial evidence. Plaintiff contends that the A.L.J. improperly focused on inconsistencies between plaintiff's testimony and other written statements from plaintiff. However, a review of the A.L.J.'s decision shows that these inconsistencies were only one factor that the A.L.J. considered in evaluating plaintiff's overall credibility. In addition to plaintiff's written statements and testimony, the A.L.J also considered whether the objective medical evidence in the record, including plaintiff's treatment history, was consistent with plaintiff's subjective complaints of pain. Hartranft v. Apfel, 181 F.3d 358, 363 (3d Cir. 1999) (holding that allegations of pain and other subjective complaints must be supported by objective medical evidence); 20 C.F.R. §§ 404.1529(c)(2), (3)(i), 3(iv-vi), (4) (discussing criteria used by A.L.J. for evaluating subjective complaints of pain); §§ 416.929(c)(2), (3)(i), 3(iv-vi), (4) (same). In this regard, the court agrees with the A.L.J.'s determination that the medical records demonstrate the existence of impairments, but they do not support the frequency or severity of the symptoms reported by plaintiff. As the A.L.J. noted, Dr. Katz placed no restrictions

21

on plaintiff's ability to work as late as August 2002, and opined
that plaintiff could perform light duty work after his accident
and as late as January 2003.

The results of plaintiff's medical testing and physical
examinations, as well as his treatment history, were consistent
with Dr. Katz's assessment. Test results from a variety of MRIs,
x-rays and EMGs of plaintiff indicated that plaintiff had "mild"
CTS, "mild spinal stenosis" and "mild degenerative changes."
Although Plaintiff sustained a mild T9 compression fracture after
his car accident, subsequent MRIs of plaintiff's spine showed no
progressive deterioration in his condition. An MRI of
plaintiff's cervical spine in March 2002 showed some "soft" disc
herniation, but no evidence of cord compression. An MRI of
plaintiff's thoracic spine during the same time period showed no
evidence of disc herniation and no cord compression.

Plaintiff's physical examinations were consistent with his
diagnostic test results and, as the A.L.J. noted, these physical
examinations supported his assessment that plaintiff's subjective
complaints of pain were not fully credible. For example, in
examining plaintiff in late 2001, Dr. Kalamchi noted that
plaintiff had an "exaggerated response to simple touching of the
middle thoracic region," and Dr. Katz noted only "mild
tenderness" over plaintiff's lower lumbosacral region.
Similarly, a physical examination of plaintiff in September 2002,

22

two days after he stopped working, was essentially normal.  (D.I. 8 at 219, 223)  Treatment notes from other examinations, including examinations in late 2003, indicate that plaintiff's condition was stable.  (Id. at 296, 299, 364-367)  These notes also indicate that plaintiff's forward flexion was "essentially free" and his neck had adequate range of motion.  (Id. at 211, 299, 361-362)  Plaintiff's SLR tests were negative and his motor strength and reflexes were intact in his upper and lower extremities, although some sensation was diminished in the medial aspect of his left forearm.  (Id. at 270, 299, 364, 68)  Further, plaintiff's treatment was essentially conservative throughout the relevant time period with the use of pain medication, but without any required surgical intervention, acupuncture, chiropractic treatment, biofeedback, hypnosis, use of a dorsal column stimulator or a sympathectomy.  Plaintiff testified that he needed to lay down frequently during the day and shift positions, but plaintiff's medical records demonstrate that no such requirement was imposed upon him by his physicians.  Further, plaintiff alleged that his medications caused drowsiness; however, the only side-effect noted in his medical records pertains to sexual dysfunction.

In addition to the disparity between his medical records and his subjective complaints, the court also agrees with the A.L.J. that inconsistencies in plaintiff's testimony and written

23

statements negatively impact his credibility. For example, plaintiff testified that he could not walk extended periods of time, but was found by police walking from his home in Clayton to a hospital in New Castle. Plaintiff also contends that none of his statements suggest that he continues to fish or hunt and, in fact, plaintiff informed the Social Security Administration that he had to give up these activities. However, in discharge summary papers from Meadow Wood in late 2002, plaintiff told physicians that "[h]e does enjoy hunting and fishing with his son." Plaintiff also reiterated that he goes to the beach, hunts, shoots and fishes for "fun" in his April 2003 psychiatric evaluation, which further undermines plaintiff's claim that he had given up these activities. Plaintiff further contends that he cannot sit for long periods of time and maintain his concentration. However, plaintiff told the SSA that he spends up to 8 hours watching television daily and that he reads magazines, science fiction and mysteries on a daily basis, with only occassional difficulty in understanding or remembering what he read. In the court's view, these statements belie the extent and severity of plaintiff's physical and psychological complaints.

Plaintiff contends that the A.L.J. improperly speculated about his continuing drug use when he evaluated plaintiff's credibility. Specifically, plaintiff contends that his counsel offered to provide the A.L.J. with an opinion from a psychologist

24

or psychiatrist regarding substance abuse, but that the A.L.J. declined the opinion stating that plaintiff testified under oath that "he's put that behind him and I'm assuming he's clean and sober." (Id. at 441) Despite making this finding at the hearing, plaintiff contends that the A.L.J. went on to find that plaintiff was not credible regarding ongoing illegal drug use.

A review of the hearing transcript indicates that plaintiff's counsel offered to submit evidence regarding whether substance abuse was a contributing factor material to plaintiff's disability. Although the A.L.J. determined that this additional evidence was not necessary in light of plaintiff's testimony, that does not mean that the A.L.J. was precluded from considering inconsistencies regarding plaintiff's drug use in evaluating his overall credibility. As the A.L.J. noted, plaintiff denied that drugs were an obsession or problem for him in the past, but admitted that he spent $7,000 on drug binges and illegally cashed checks to obtain drugs. Given the extensive support for the A.L.J.'s determination that plaintiff was not fully credible, the court cannot conclude that the A.L.J.'s remarks regarding plaintiff's substance abuse improperly tainted the A.L.J.'s credibility assessment.

In sum, the court concludes that the A.L.J.'s credibility determination was supported by substantial evidence. The A.L.J. properly weighed plaintiff's subjective complaints of pain in

25

light of the objective medical evidence and plaintiff's
statements in the record. In these circumstances, the court
cannot conclude that the A.L.J.'s decision was erroneous.

> **2. Whether The A.L.J. Failed To Include All Of
> Plaintiff's Documented Limitations In Considering
> Plaintiff's RFC And The Testimony Of The
> Vocational Expert**

Plaintiff next contends that the A.L.J. erred in failing to
include all of plaintiff's documented limitations in his RFC
assessment of plaintiff and his corresponding hypothetical
question to the vocational expert at the hearing. Specifically,
plaintiff contends that, although the A.L.J. afforded
"significant" weight to the opinions of the state agency
physicians, he failed to consider a variety of limitations posed
by those physicians in their physical and mental evaluations of
plaintiff, including that plaintiff (1) could only occasionally
climb, stoop, kneel, crouch and crawl; (2) must avoid
concentrated exposure to wetness, humidity, fumes, odors, dust,
gases and hazards; (3) must avoid even moderate exposure to
extreme cold; and (4) was moderately limited in his ability to
understand, remember and carry out detailed instructions,
maintain attention and concentration for extended periods of
time, complete a normal workday and workweek without interruption
from psychologically based symptoms, and perform at a consistent
pace without an unreasonable number and length of rest periods.

"[R]esidual functional capacity ["RFC"] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001). When determining an individual's RFC at step four of the sequential evaluation, the A.L.J. must consider all relevant evidence including medical records, observations made during medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others. Id. Before an individual's RFC can be expressed in terms of an exertional level of work, the A.L.J. "must first identify the individual's functional limitations or restrictions and assess his or her work related abilities on a function by function basis." SSR 96-8p. The RFC must also address both the exertional and non-exertional capacities of the individual. Id. Non-exertional capacity refers to "all work-related limitations and restrictions that do not depend on an individual's physical strength," such as limitations which are psychological or mental in nature. Id.; 20 C.F.R. § 1469(a)(c) (listing examples of non-exertional limitations).

The A.L.J.'s RFC assessment must "be accompanied by a clear and satisfactory explanation of the basis on which it rests." Fargnoli, 247 F.3d at 41. In weighing the evidence, the A.L.J. must give some indication of the evidence which he or she rejects

27

and his or her reason for discounting the evidence.  Burnett v.
Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000); see
also SSR 96-8p.  "In the absence of such an indication, the
reviewing court cannot tell if significant probative evidence was
not credited or simply ignored."  Cotter v. Harris, 642 F.2d 700,
705 (3d Cir. 1981).

     Reviewing the A.L.J.'s decision in light of the record as a
whole, the court concludes that the A.L.J.'s decision that
plaintiff retained the RFC to perform a significant range of
light work was supported by substantial evidence.  In reaching
this conclusion, the A.L.J. specifically noted that plaintiff
"ha[d] the following residual functional capacity:  he can sit,
stand and walk for prolonged periods of time, and lift weights of
up to 20 pounds.  He is limited nonexertionally to jobs that do
not entail more than simple instructions."  (D.I. 8 at 25)  In
restricting plaintiff to jobs with simple instructions, the court
concludes that the A.L.J. adequately accounted for the moderate
limitation in maintaining concentration, persistence or pace
which was identified by both state agency physicians in their
psychological evaluations of plaintiff and supported by
plaintiff's medical records.

     Plaintiff contends that the A.L.J. did not adequately
account for the other psychological limitations identified by the
state agency physicians.  The court disagrees with plaintiff's

28

assertion. Besides concentration, persistence or pace, which was already taken into account by the A.L.J's decision, the A.L.J. is required to assess the degree of a person's functional limitation based on the extent to which the limitation affects 3 other functional areas: (1) episodes of decompensation, (2) activities of daily living, and (3) social functioning. 20 C.F.R. §§ 404.1520a(c)(2)-(3), 416.920a(c)(3). In his decision, the A.L.J. specifically noted that plaintiff's condition had not resulted in repeated episodes of decompensation for extended periods of time and that plaintiff's psychiatric hospitalizations and low GAF scores were linked to his drug abuse, which was no longer an issue according to plaintiff. (Id. at 20, 22) The A.L.J. noted that plaintiff's low GAF scores did not persist and that his scores improved significantly after treatment and abstinence from drugs. The A.L.J. further recognized that plaintiff had some problems with impulse control throughout his psychological exams, but that during the majority of his examinations he exhibited good judgment, intact cognitive abilities, average intelligence and an alert and oriented disposition. (Id. at 316-317, 373, 379-380, 390) The A.L.J. further considered these examination results in the context of plaintiff's daily activities and social interaction and concluded that they did not preclude plaintiff from all work related activity, but only limited him to tasks involving simple instructions. (Id. at 20, 22) The court agrees

29

with the A.L.J.'s assessment, and further notes that in addition
to the recreational activities referred to by the court in the
context of the A.L.J.'s credibility determination, plaintiff also
reported, among other things, that he was able to care of his
personal needs and partake in a variety of other activities, at
least occasionally, including going to the movies, going out to
dinner, dating and performing household chores.  On a social
level, plaintiff acknowledged that he got along well with his
family and friends and spent time with his children and fiancé.
(Id. at 86-90)  Because substantial evidence supports the
A.L.J.'s analysis, the court cannot conclude that the A.L.J.
erred in failing to consider any significant psychological
limitations on plaintiff's abilities.

     As plaintiff notes, however, the A.L.J. did not consider
other non-exertional limitations identified by the state agency
physicians regarding certain environmental restrictions on
plaintiff and restrictions on his ability to perform such
activities as crawling and stooping.  In the court's view, these
limitations do not have a significant impact on plaintiff's RFC
and, therefore, the court cannot conclude that the A.L.J.'s RFC
assessment was erroneous.  As defendant points out, the ability
to stoop occasionally leaves the sedentary and light work base
virtually intact, and the ability to crawl and kneel are
considered rare activities in even more arduous occupational

bases. SSR 85-15. Further, the environmental restrictions
placed on plaintiff, including the restriction on being around
dangerous machinery and on unprotected elevations, are not
restrictions that have a significant effect on work at any
exertional level, let alone the light exertional level. Indeed,
the state agency physicians who identified these limitations
considered them in their RFC assessments and still concluded that
plaintiff could perform work in the light exertional range.
Accordingly, the court is persuaded that the limitations
identified by the state agency physicians do not significantly
erode plaintiff's ability to perform light work as determined by
the A.L.J. and, therefore, the court cannot conclude that the
A.L.J.'s failure to expressly consider those limitations in his
RFC or in the context of his hypothetical question to the
vocational expert requires reversal of the A.L.J.'s decision.
Cf., Perkins v. Barnhart, 79 Fed. Appx. 512, 515 (3d Cir. 2003)
(recognizing that A.L.J.'s failure to consider combined effects
of claimant's impairment as required by the regulations was
"potentially troubling," but "harmless error" because, even if
the combination of ailments had been considered, it would have
had no effect on the A.L.J.'s decision).

31

    **3.    Whether Remand Is Appropriate In Light Of The**
            **Availability Of New And Material Evidence That**
            **Plaintiff's Condition Is Worse Than Initially**
            **Determined By The A.L.J.**

Plaintiff also contends that the court should remand this matter pursuant to 42 U.S.C. § 405(g) because new and material evidence has become available since the hearing which demonstrates that plaintiff's condition is more severe than originally determined by the A.L.J. Specifically, plaintiff directs the court to (1) the September 14, 2005 operative report of Bikash Bose, M.D., a neurosurgeon (D.I. 14, ex. A at 1-3); (2) MRIs and radiographs taken in March 2005 (id. at 4-6); (3) medical records from Dr. Bose, including a March 16, 2005 letter from Dr. Bose to Anthony DiMaio, M.D. (id. at 7-8); (4) a report from Frederick DiMeo, PA-C detailing the results of plaintiff's late December 2004 physical examination (id. at 9-10); (5) Dr. Balu's September 28, 2005 and December 9, 2005 opinions that plaintiff could not return to any gainful employment (id., ex. B at 1-5); (6) November and December 2004 gastroenterology records from Parag Lodhavia, M.D. (id., ex. C at 1-3); (5) an August 2004 report from Wendy S. Newell, a surgeon (id. at 4); and (6) August 2004 hospitalization records from Kent General Hospital (id. at 5-11).

Pursuant to 42 U.S.C. § 405(g), the court may remand a case to defendant "only upon a showing that there is new evidence which is material and that there is good cause for the failure to

32

incorporate such evidence into the record in a prior proceeding."
Evidence is considered new if it is not cumulative to evidence
already in the record. Evidence is considered material if it is
relevant to the time period for which benefits were denied and
reasonably likely to have altered the A.L.J.'s decision if it
were known at the time. Evidence is not material if it concerns
"a later-acquired disability or the subsequent deterioration of a
previously non-disabling condition." Szubak v. Secretary of HHS,
745 F.2d 831, 833 (3d Cir. 1984). To demonstrate good cause, the
plaintiff must show some justification for the failure to acquire
and present the evidence during the administrative phase of the
proceedings. The purpose of the good cause requirement is to
prevent claimants from withholding evidence in order to "obtain[]
another bite of the apple" and turning the administrative
proceedings into an "informal, end run method of appealing an
adverse ruling by the Secretary." Id. at 834 (citations
omitted).

    The court has reviewed the evidence offered by plaintiff in
light of the criteria required for a remand and concludes that
plaintiff has not demonstrated that the evidence is new or
material, or that good cause prevented its earlier admission into
evidence. Plaintiff contends that Dr. Bose decided to perform
surgery on plaintiff in response to only minor changes in
severity from his previous condition, suggesting that plaintiff's

33

condition was worse than the A.L.J. found in his decision. However, Dr. Bose acknowledged that he performed surgery in response to plaintiff's complaints of worsening symptoms and, therefore, the evidence suggests to the court a possible deterioration of plaintiff's non-disabling condition which does not qualify as "new" evidence for purposes of a remand.[6]

Similarly, the evidence from Mr. DiMeo's report suggests that plaintiff strained his lumbosacral spine three months after the relevant period ended.  Therefore, Mr. DiMeo's report pertains to a newly developed condition which does not provide justification for a remand.

As for Dr. Balu's September and December 2005 opinions that plaintiff is unable to work, the court concludes that Dr. Balu's opinions pertain to the period after the A.L.J. issued his decision and, therefore, they are evidence of a continuing deterioration of his condition.  However, even if Dr. Balu's opinions can be construed to refer to plaintiff's previous condition, the court concludes that they do not justify a remand

---

[6]     Further, the court notes several inconsistencies in the medical records of Dr. Bose which further demonstrate to the court that the A.L.J.'s decision regarding plaintiff's credibility was not erroneous.  See infra section II.A. of this memorandum opinion.  For example, plaintiff complained that he dropped things with his hands, but a neurological examination of plaintiff by Dr. Bose revealed that plaintiff had 5/5 motor strength in his upper extremities.  Plaintiff also had glutei and hamstring strength at 8/10 on the left and 9/10 on the right, with the remainder of his motor groups at 5/5 and no paravertebral muscle spasms.

34

of this case. In the court's view, plaintiff has not provided sufficient justification for his failure to obtain these opinions earlier, and the opinions are cumulative to Dr. Balu's February and March 2004 opinions that plaintiff was unable to work. Further, and in any event, the court is not persuaded that Dr. Balu's opinions are reasonably likely to result in a change to the A.L.J.'s decision. A treating physician's assertion that a plaintiff is disabled is not dispositive of the issue. Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994). Moreover, Dr. Balu provides no medical evidence to support his conclusions and, to the extent Dr. Balu's opinions pertain to the period prior to the A.L.J.'s opinion, they are inconsistent with the other medical evidence in the record, including the opinions of Dr. Katz and the state agency physicians.

Plaintiff also contends that the newly acquired evidence regarding plaintiff's Hepatitis C demonstrates that plaintiff's condition was more severe than determined by the A.L.J. In the court's view, however, the evidence offered by plaintiff supports the A.L.J.'s determination that plaintiff's Hepatitis C was not severe and, therefore, the court is not persuaded that the evidence related to plaintiff's Hepatitis C raises the reasonable possibility of reversal of the A.L.J.'s decision. The evidence offered by plaintiff reveals that he did not have end-stage liver disease, but "mild non-specific" Hepatitis. Results of

35

plaintiff's August 2004 biopsy and reports from his physicians reveal no fibrosis, an unremarkable right upper quadrant and no ongoing gallbladder problem after his cholecystectomy for cholelithiasis. Moreover, the only treatment recommended to plaintiff for his Hepatitis C was that he abstain from consuming alcohol. In these circumstances, the court cannot conclude that plaintiff's Hepatitis C was more severe than noted by the A.L.J. in his decision.

In sum, the court is not persuaded that the newly acquired evidence offered by plaintiff warrants a remand of this case to the A.L.J. In the court's view, the evidence is not reasonably likely to result in a change to the A.L.J's decision and, in many circumstances, the evidence pertains to a new condition or a worsening of plaintiff's previous non-disabling condition such that the evidence is immaterial to the time frame prior to the A.L.J.'s decision. Accordingly, the court will deny plaintiff's request for a remand.

## VI. CONCLUSION

For the reasons discussed, the court will grant defendant's cross-motion for summary judgment, and deny plaintiff's motion for summary judgment. The decision of the Commissioner dated September 18, 2004 will be affirmed.

An appropriate order will be entered.